Joseph HUSSEY

v.

CHASE MANHATTAN BANK, et al.

No. Civ.A. 02–7099.

United States District Court, E.D. Pennsylvania.

Sept. 1, 2005.

Mark Joseph Schwemler, Elliott Reihner Siedzikowski & Egan PC, Blue Bell, PA, Patricia Collins, Antheil Maslow & MacMinn LLP, Doylestown, PA, for Joseph Hussey.

Brian T. Ortelere, Jill S. Welch, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Chase Manhattan Bank, et al.

## MEMORANDUM & ORDER

SURRICK, District Judge.

In this action, Plaintiff Joseph Hussey alleges that Defendants Chase Manhattan Bank, Chase Manhattan Mortgage Corporation, JP Morgan Chase & Co., and Director of Human Resources, Chase Manhattan Bank (collectively "Chase" or "Defendants") breached their fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 829, by failing "to convey to Plaintiff complete and accurate information regarding the [long-term disability] benefits for which he was eligible, and complete and accurate information as to steps to be taken to enroll in those benefits."[1] (Compl.¶ 31.) A non-jury trial was held on August 1–2, 2005. (Doc. Nos. 67, 68.) Based upon

---

1. Plaintiff's cause of action arises under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) (2000).

the evidence and testimony presented at trial, we make the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) and enter judgment in favor of Defendants.

## I. FINDINGS OF FACT

### A. Parties and Witnesses

Plaintiff Joseph Hussey joined Defendant Chase Manhattan Mortgage Corporation ("CMMC") in June 1997 as a mortgage banker in CMMC's Newark, Delaware office. (Tr. 8/1/05 at 15, 51, 60;[2] Defs.' Ex. 4.) Prior to working at CMMC, Plaintiff had been a loan officer at Maryland National Mortgage. (Tr. 8/1/05 at 51.)

Maureen Hussey is Plaintiff's wife. (*Id.* at 14.)

Greta Huegel ("Huegel") was Plaintiff's supervisor at CMMC and is Vice President and manager of CMMC's Newark, Delaware office. (*Id.* at 51, 54.) Huegel also began employment with CMMC in June 1997 after working at Maryland National Mortgage, where she had been Vice President and Area Manager. (*Id.* at 51.) Huegel and Plaintiff worked together at Maryland National Mortgage for approximately ten years. (*Id.*)

Catharine Berliner ("Berliner") is Vice President for Corporate Benefits in Chase Manhattan Bank. (*Id.* at 135–36.) Prior to 1999, Berliner shared oversight for employee benefit plans with Tara Bettendorf, the Vice President in charge of health and income protection benefits. (*Id.* at 140.) In the fall of 1998, Berliner was responsible for administering the open enrollment period for Chase employees' benefit elections for 1999. (*Id.*)

At all times relevant to the case, CMMC was a subsidiary of Defendant Chase Manhattan Bank. (*Id.* at 136.) CMMC is pres-

ently a subsidiary of Defendant J.P. Morgan Chase & Co. (*Id.*)

### B. Plaintiff's Initial Benefit Elections

Upon arriving at CMMC, Huegel gave Plaintiff a package of information regarding CMMC's optional employee benefit programs. (Tr. 8/1/05 at 60; Tr. 8/2/05 at 64–65.) This package of information included a binder labeled "Welcome to Chase," which described the terms and conditions of CMMC's various employee benefit plans. (Tr. 8/1/05 at 60, 181–82; Tr. 8/2/05 at 64–65; Pl.'s Ex. 85; Defs.' Ex. 1.)

The Long–Term Disability ("LTD") Plan was one of the optional benefits described in the "Welcome to Chase" binder. (Tr. 8/1/05 at 182–86; Defs.' Ex. 1 at B–46 to B–48.) The "Welcome to Chase" binder introduced the LTD Plan as follows:

**Disability Insurance**

No one likes to think about the possibility of becoming seriously ill or injured. However, if you become disabled, you still need to pay the bills and meet your other financial obligations. . . . Chase offers a Medical Leave and Long–Term Disability (LTD) Plan to provide a source of income if you are sick or disabled for periods of time.

**Long–Term Disability (LTD) Plan**

The Long–Term Disability (LTD) Plan is administered by Liberty Mutual and can begin to pay benefits following 26 weeks of absence due to total and permanent disability. The level of benefits is based on the option you choose.

(Pl.'s Ex. 85 at B–46.) The binder then explained that Chase employees had the option of choosing among three levels of benefit payments from the LTD Plan, based on the employee's eligible compensa-

---

**2.** "Tr." refers to the transcript of the trial     testimony in this matter.

tion: 50% of annual salary with a maximum monthly benefit of $6,250; 60% of annual salary with a maximum monthly benefit of $7,500; and 70% of annual salary with a maximum monthly benefit of $8,750. (*Id.*)

The "Welcome to Chase" binder also described the optional LTD Excess Plan, which applied to employees with an annual Benefit Eligible Compensation ("BEC") in excess of $150,000. (*Id.* at B–48.) The binder explained the LTD Excess Plan as follows:

**Long–Term Disability Excess Plan**

CHASE*Choice* Excess LTD coverage applies to eligible compensation above $150,000. If your eligible compensation is more than $150,000 and you elect to participate in the Long–Term Disability Plan, you may also choose to enroll in the LTD Excess Plan.... The same level of coverage you elected in the LTD Plan (i.e., 50%, 60%, or 70%) will apply to eligible compensation above $150,000 up to a maximum of $600,000.

**Costs**

The contribution rates for the LTD Excess Plan will be higher than those for the LTD Plan. See the "Enrolling in CHASE*Choice*" section.

(*Id.*)

Finally, in a section entitled "Enrolling in Chase*Choice*," the "Welcome to Chase" binder explained how an employee could enroll in the LTD Plan and the LTD Excess Plan and the costs and benefits of the various plan options. (*Id.* at B–79, B–89 to B–90.) The binder stated that under the LTD Plan, employees could select one of the following coverage options: (1) 50% of annual salary with a maximum monthly benefit of $6,250; (2) 60% of annual salary

with a maximum monthly benefit of $7,500; and (3) 70% of annual salary with a maximum monthly benefit of $8,750. (*Id.* at B–89.) The binder further explained that "[i]f your eligible compensation as of your hire date is more than $150,000 and you elect to be covered by the LTD Plan, you will have the option of enrolling in the LTD Excess Plan." (*Id.* at B–90.) If an eligible employee elected the LTD Excess Plan, the "level [percentage] of coverage will be the same as your LTD Plan coverage." (*Id.*) The binder also stated that there was an additional cost to enrolling in the LTD Excess Plan.[3] (*Id.* at B–89 to B–90.)

As a commissioned sales employee, Plaintiff's BEC was calculated by adding together his base salary, monthly draw, sales commissions, and "production overrides" based on a certain percentage of the commissions earned by loan officers under his supervision. (Tr. 8/1/05 at 153–54; Tr. 8/2/05 at 3; Pl.'s Ex. 2.) Because Plaintiff did not have a history of earnings with CMMC, his initial BEC was set at $50,000. (Tr. 8/1/05 at 201; Pl.'s Ex. 2.)

In his initial enrollment in June 1997, Plaintiff elected the 70% coverage option under the LTD Plan. (Tr. 8/1/05 at 191–92; Defs.' Ex. 3 at CMMC000701; Def.'s Ex. 7.) This was the highest level of long-term disability benefits available to Plaintiff at that time. (Tr. 8/2/05 at 42.) Plaintiff was not eligible to participate in the LTD Excess Plan in June 1997 because his BEC was $50,000, below the $150,000 eligibility threshold. (Tr. 8/1/05 at 57–58, 60–61, 211–12; Tr. 8/2/05 at 39–42; Pl.'s Ex. 2.)

At the time of his hire, Plaintiff also enrolled in group universal life insurance

---

**3.** The biweekly cost for the LTD Plan ranged from .009% to .012% of the employee's eligible compensation, depending on the level (percentage) of coverage selected. (Pl.'s Ex. 85 at B–89.) The biweekly cost for the LTD Excess Plan ranged from .023% to .033% of eligible compensation, depending on the level (percentage) of coverage selected. (*Id.* at B–90.)

coverage. (Tr. 8/1/05 at 213, 215; Defs.' Ex. 10.) Plaintiff selected group universal life insurance in the amount of $400,000, eight times his BEC, which was the maximum amount available to him at that time. (Tr. 8/1/05 at 213, 215.)

### C. Open Enrollment for 1998

During the annual open enrollment period, a Chase employee could make changes or elect to participate in any of the optional employee benefit plans for the following calendar year. (Tr. 8/1/05 at 192–93.) For 1998, Chase's open enrollment period ran from October 15, 1997, through November 15, 1997. (Defs.' Ex. 9.)

#### 1. Enrollment Bulletin

Prior to the open enrollment period, Chase distributed a document entitled "Your 1998 Chase*Choice* Enrollment Bulletin" ("Enrollment Bulletin") to all of its employees. (Tr. 8/1/05 at 193–95; Defs.' Ex. 11.) On its cover, the Enrollment Bulletin explained that an employee's existing benefits selections would continue for 1998 unless the employee changed those selections:

> In addition, Chase*Choice* is easy … easy to review and easy to enroll in. If you are satisfied with your current coverages, you do not need to do anything—with the exception of contributions to the spending accounts. Your other coverages will automatically continue in 1998. In fact the only time you need to do anything is if you wish to change your current coverage or if you wish to contribute to the spending accounts.

(Defs.' Ex. 11 at unnumbered 1.) A similar statement was included in page 3 of the Enrollment Bulletin, informing employees that their current benefit elections would continue for 1998 unless they contacted oneCHASE, an automated telephone system, to change their benefit elections. (*Id.* at 3; Tr. 8/1/05 at 196.)

The Enrollment Bulletin also described a change to the LTD Plan. It stated that beginning on January 1, 1998, the amount of eligible compensation covered under the LTD Plan would increase from $150,000 to $160,000. (Defs.' Ex. 11 at 4.) The Enrollment Bulletin also explained that "[e]ligible compensation in excess of $160,000 may continue to be covered under Chase's LTD Excess Plan, up to a maximum of $600,000." (*Id.*)

Finally, the Enrollment Bulletin informed Chase employees that they would receive a Chase*Choice* Enrollment Kit ("Enrollment Kit") in approximately one week. (*Id.* at unnumbered 1.) The Enrollment Bulletin stated that the Enrollment Kit would provide costs for the various employee benefit plans for 1998 and instructions on how to use the oneCHASE automated telephone system for making benefit elections. (*Id.*)

#### 2. Enrollment Kit

Shortly before October 15, 1997, Chase distributed the Enrollment Kit to all employees through interoffice mail. (Tr. 8/1/05 at 193–5; Defs.' Ex. 9.) Included in the Enrollment Kit were the following documents: (1) a Personalized Fact Sheet ("PFS") that highlighted the employee's current coverage options with 1998 costs; (2) an Enrollment Guide that outlined the directions for making benefit elections through the oneCHASE automated telephone service; (3) additional forms required for certain benefit elections; and (4) a slip sheet explaining the calculation of an employee's eligible compensation for benefits. (Tr. 8/1/05 at 193, 200; Defs.' Exs. 9–10, 12.)

#### a. Personalized Fact Sheet

The PFS is an individualized document prepared separately for each employee. (Tr. 8/2/05 at 87–88, 104–06.) It contains

personal information for each employee, including the employee's interoffice mailing address, his or her personal identification number ("PIN") to access the one-CHASE telephone system and to make benefit elections, and his or her BEC amount. (Tr. 8/1/05 at 194.) It also includes a list of all benefit plans that the employee had previously selected, a list of all benefit plans that the employee would be able to select for 1998, and the cost of each benefit plan. (*Id.*)

### b. *1998 Enrollment Guide*

The 1998 Enrollment Guide is a booklet that described all of Chase's employee benefit plans, the cost of each plan, and the plan's eligibility requirements, if applicable. (Tr. 8/1/05 at 194; Defs.' Ex. 12.) The Enrollment Guide also included instructions on how to use the oneCHASE telephone system to make benefit elections for 1998. (Defs.' Ex. 12.)

Like the Enrollment Bulletin, the Enrollment Guide for 1998 explained that if an employee did not make any changes through the oneCHASE system, the employee's benefit selections for 1997 would remain the same for 1998. (*Id.* at 2.) In other words, the employee would have to make an affirmative election to enroll in an additional employee benefit plan. (Tr. 8/1/05 at 196.)

The Enrollment Guide for 1998 also explained Chase's long-term disability benefit plans as follows:

1. *LTD Plan.* You can choose long-term disability (LTD) protection that replaces either 50%, 60%, or 70% of your eligible compensation (up to $160,000).... Here are your options:

   1. Replacement of 50% of your eligible compensation, up to a maximum monthly benefit of $6,667.

   2. Replacement of 60% of your eligible compensation, up to a maximum monthly benefit of $8,000.

   3. Replacement of 70% of your eligible compensation, up to a maximum monthly benefit of $9,333.

   4. No coverage.

2. *LTD Excess Plan.* If you choose coverage under LTD and your annual eligible compensation is more than $160,000, you may also choose to enroll in the LTD Excess Plan. The plan's provisions are exactly the same as the LTD Plan provisions. However, contribution rates for the LTD Excess Plan will be higher than those for the LTD Plan. The same level of coverage you selected in the LTD Plan (50%, 60%, or 70% of eligible compensation) will apply to eligible compensation above $160,000, up to a maximum eligible compensation level of $600,000.

(Defs.' Ex. 12 at 36.) Finally, the Enrollment Guide explained how an employee could change his or her long-term disability benefit elections through the automated oneCHASE telephone system. (*Id.* at 37–39.)

### c. *Slip Sheet*

The Enrollment Kit also included a slip sheet that explained how CMMC calculated its commissioned-based employees' BEC. (Tr. 8/1/05 at 200; Tr. 8/2/05 at 67; Defs.' Ex. 10.) The slip sheet stated that an employee's BEC would be the greater of: (1) the employee's base salary, draw, commissions, and production overrides from August 1, 1996, to July 31, 1997; (2) $50,000; or (3) for internal transfers, the employee's prior base salary (excluding overtime and performance-related bonuses) for the same time period. (Defs.' Ex. 10.) For employees who had less than twelve months of service with Chase, the slip sheet explained that their BEC would be calculated as the greater of the employee's earnings through July 31, 1997, or a

fixed amount. (*Id.*) The slip sheet also alerted new employees that their BEC would be recalculated each year based on their most recent twelve months of earnings:

> Please note that this amount [the employee's BEC] will be calculated each July 31 and used for the following year's annual enrollment. *Your cost and amount of LTD coverage will change annually with the pay period in which the new 12–month average of commissions is calculated.*

(*Id.* (emphasis added).)

### 3. Plaintiff's Benefit Elections for 1998

During the open enrollment period, Plaintiff made no changes to his selection of the LTD Plan at the 70% level, with no LTD Excess Plan. (Tr. 8/1/05 at 213; Defs.' Ex. 14.) Plaintiff's LTD Plan coverage at 70% of eligible compensation up to a maximum of $160,000 thus remained in place for 1998. (Tr. 8/1/05 at 213; Defs.' Ex. 14.) Plaintiff was not eligible to elect the LTD Excess Plan, as his BEC level remained at $50,000 for the 1998 plan year. (Tr. 8/1/05 at 201; Pl.'s Ex. 2.) Accordingly, Plaintiff had the maximum amount of long-term disability coverage available to him for 1998.

### D. Open Enrollment for 1999

In the fall of 1998, Chase designated October 14, 1998, to November 4, 1998, as the open enrollment period for employees to make changes to their benefit elections for 1999. (Defs.' Ex. 18 at unnumbered 1.) Chase notified or attempted to notify Plaintiff about the open enrollment period and the benefits that he could elect during open enrollment in several different ways. Those ways included email, announcements at staff meetings, Chase's internal computer network (intranet), and interoffice mail.

### 1. Email

In the fall of 1998, Chase's corporate benefits department announced the open enrollment period at its Newark, Delaware location by sending at least two e-mails to all of its employees. (Tr. 8/2/05 at 71–72.) As branch manager, Huegel forwarded these emails to all of the employees in the Newark office as a reminder that open enrollment was coming. (*Id.* at 72.) In total, employees in the Newark office received between three to six emails regarding the open enrollment period in 1998. (*Id.*) Plaintiff had access to email during this time. (*Id.*)

### 2. Staff Meeting Announcements

In her monthly staff meetings in October and November, Huegel made announcements to her staff about open enrollment periods. (*Id.* at 72–73.) Huegel made these announcements to alert her employees to the open enrollment deadlines and to remind them to take action on their benefit selections before the deadline. (*Id.* at 72.) Huegel held these staff meetings on the first Wednesday of every month, and held at least one prior to the open enrollment period in October 1998. (*Id.*) Plaintiff typically attended these meetings. (*Id.*) In addition, Huegel required notes be taken at monthly staff meetings for anyone who was not in attendance. (*Id.*)

### 3. Enrollment Bulletin and PFS

Prior to the beginning of open enrollment in October 1998, Chase distributed to all its employees an Enrollment Bulletin announcing the dates of the open enrollment period, recent changes to the various employee benefit plans, and the procedure for enrolling in the benefit plans through the oneCHASE automated telephone system. (Tr. 8/1/05 at 218; Defs.' Ex. 18.) The Enrollment Bulletin also explained

how an employee could obtain copies of the Enrollment Kit for 1999, which contained more detailed information on each employee benefit plan and the oneCHASE automated telephone enrollment process. (Defs.' Ex. 18 at 4–5.) In addition, the cover of the Enrollment Bulletin restated that an employee's current benefit elections would continue for 1999 unless the employee changed them through the oneCHASE system. (*Id.* at unnumbered 1.)

A copy of each employee's PFS was enclosed with the Enrollment Bulletin. (*Id.*) An employee's PFS included the following information: (1) the employee's BEC for 1999; (2) the employee's PIN, which was required to access the oneCHASE automated telephone system for benefit elections; and (3) the employee's current benefit elections. (Tr. 8/1/05 at 219; Defs.' Ex. 21.) Specifically, for the long-term disability benefit, the PFS stated the employee's current benefit election, including whether the employee (if eligible) had elected LTD Excess Plan coverage. (Defs.' Exs. 21–22.) The PFS also included information on the dates of the open enrollment period and the telephone number to access the oneCHASE system to make benefit election changes. (Defs.' Ex. 21.)

Copies of the Enrollment Bulletin and PFS were distributed to all Chase employees via interoffice mail in October 1998. (Tr. 8/1/05 at 220–21.) Each PFS included an interoffice mailing address to ensure that it reached the proper recipient. (Defs.' Exs. 21–22.) Chase contracted with Watson Wyatt Worldwide, Inc., a benefits consulting firm, to provide project management and programming services for its annual open enrollment period in the fall of 1998. (Tr. 8/2/05 at 18, 86–87.) Bridget Gibbons ("Gibbons"), a senior con-sultant with Watson Wyatt, managed the overall project for Chase. (*Id.* at 86–87.) Gibbons oversaw the preparation of Chase employees' PFS, preparation of the script for the oneCHASE telephone enrollment system, and the distribution of all enrollment materials to Chase employees. (*Id.* at 87–89.) Watson Wyatt, under Gibbons's supervision, printed each employee's PFS and then sorted, boxed, and shipped the PFSs to a third-party collator. (*Id.* at 88, 104–05.) During this process, Watson Wyatt performed extensive testing to ensure that the PFSs were printed and addressed correctly. (*Id.* at 88, 112.) The collator then matched the PFSs with the Enrollment Bulletin and shipped the packets to Chase's mail rooms. (*Id.* at 105.)

Once Chase received the packets, they were forwarded to each Chase facility, including its Newark, Delaware, office, through interoffice mail. (*Id.* at 73–74.) At the Newark office, the receptionist received the enrollment materials and distributed the individual packets to each employee's mail box. (*Id.* at 73–75.) All Chase employees who testified at trial, including Huegel, Plaintiff's supervisor, received their Enrollment Bulletin and PFS in the fall of 1998. (Tr. 8/1/05 at 221; Tr. 8/2/05 at 74–77; Defs.' Ex. 20.) Huegel was not aware of any problems related to the delivery of enrollment materials and PFSs in the Newark office in the fall of 1998.[4] (Tr. 8/2/05 at 74.) Plaintiff did not complain to Huegel that he did not receive his Enrollment Bulletin or PFS. (Tr. 8/2/05 at 72–73.) In addition, no witness at trial testified that Plaintiff did not in fact receive his enrollment materials or PFS. Accordingly, we find that Plaintiff received his Enrollment Bulletin and PFS for open enrollment in the fall of 1998.

---

**4.** In addition, Gibbons received no complaints from Chase that the PFSs were not properly delivered, and Berliner was not aware of any problems related to the distribution of the enrollment materials. (Tr. 8/2/05 at 22–23, 112.)

### 4. Enrollment Guide

Similar to the 1998 Enrollment Guide, the 1999 Enrollment Guide described all of Chase's employee benefit plans, the cost of each plan, and the plan's eligibility requirements, if applicable. (Tr. 8/1/05 at 223–26; Defs.' Ex. 19.) The 1999 Enrollment Guide also included instructions on how to use the oneCHASE telephone system to make benefit elections for 1999. (Tr. 8/1/05 at 226; Defs.' Ex. 19.) These instructions are the same as those provided to Chase employees in the 1998 Enrollment Guide. (Tr. 8/1/05 at 266; Defs.' Ex. 19.)

The 1999 Enrollment Guide stated that if Chase employees made no changes to their benefit elections, their current benefits would continue for 1999: "To keep the coverages you had for 1998 (except Spending Account contributions), *you do nothing.* Your current coverage will automatically carry over at 1999 costs." (Tr. 8/1/05 at 224–25; Defs.' Ex. 19 at 2.) The Enrollment Guide also informed employees that if they wanted to change their benefit elections, they would need to do so through the oneCHASE telephone system. (Defs.' Ex. 19 at 2.)

In language virtually identical to the 1998 Enrollment Guide, the 1999 Enrollment Guide explained that employees who had a BEC in excess of $160,000 were eligible to select the LTD Excess Plan for 1999:

1. *LTD Plan.* You can choose long-term disability (LTD) protection that replaces either 50%, 60%, or 70% of your eligible compensation (up to $160,000).... Here are your options:

    1. Replacement of 50% of your eligible compensation, up to a maximum monthly benefit of $6,667.

    2. Replacement of 60% of your eligible compensation, up to a maximum monthly benefit of $8,000.

    3. Replacement of 70% of your eligible compensation, up to a maximum monthly benefit of. $9,333.

    4. No coverage.

2. *LTD Excess Plan.* If you choose coverage under LTD and your annual compensation is more than $160,000, you may also choose to enroll in the LTD Excess Plan. The plan's provisions are exactly the same as the LTD Plan provisions. However, contribution rates for the LTD Excess Plan will be higher than those for the LTD Plan. The same level of coverage you elected for the LTD Plan (50%, 60%, or 70% or eligible compensation) will apply to eligible compensation above $160,000, up to a maximum eligible compensation of $600,000.

(Tr. 8/1/05 at 227; Defs.' Ex. 19 at 33.)

Finally, the Enrollment Guide for 1999 explained the procedure for selecting long-term disability coverage, including the LTD Excess Plan, through the automated oneCHASE telephone system. (Defs.' Ex. 19 at 36.) The employee would first select the long-term disability benefits menu from the main menu. (Tr. 8/2/05 at 92–93.) The employee would then select whether he or she wished to elect LTD Plan coverage at the 50%, 60%, or 70% level. (Defs.' Ex. 19 at 36; Tr. 8/2/05 at 99.) Employees who were eligible for the LTD Excess Plan benefit would then hear an additional automated message inquiring whether they wanted to elect the LTD Excess Plan.[5] (Defs.' Ex. 19 at 36; Tr. 8/2/05 at 99–100.) The employee would then press the "1"

---

5. If an employee was not eligible for the LTD Excess Plan, this additional automated message would not be played. (Tr. 8/2/05 at 100.)

key on the telephone to elect the LTD Excess Plan or "2" to decline it. (Defs.' Ex. 19 at 36; Tr. 8/2/05 at 100.) The automated system would then restate the employee's long-term disability benefit elections, including whether he or she had selected the LTD Excess Plan, and ask the employee to confirm them. (Tr. 8/2/05 at 100–02.)

The 1999 Enrollment Guide was made available to all Chase employees through their email program (Lotus Notes), their Internet browser, and by contacting the oneCHASE telephone system. (Tr. 8/1/05 at 226; *see also infra* Part I.D.5.)

### 5. *Intranet*

On October 5, 1998, Chase introduced "Benefits On–Line"—an intranet page that allowed Chase employees to access benefit enrollment materials, including the Enrollment Bulletin and the 1999 Enrollment Guide, on their computer. (Tr. 8/1/05 at 216; Defs.' Ex. 17.) These materials could be accessed either through Lotus Notes, an email program provided to Chase employees, or an Internet browser. (Defs.' Ex. 17.)

Chase announced the Benefits On–Line program through a bulletin entitled "CHA-SEChoice Enrollment Bulletin: Introducing ... Benefits On–Line!" (Tr. 8/1/05 at 216; Defs.' Ex. 17.) This bulletin explained how an employee could access their enrollment materials through their computer using either Lotus Notes or an Internet browser. (Defs.' Ex. 17 at unnumbered 1.) The bulletin was distributed to all Chase employees, including those in the Newark, Delaware office, through interoffice mail. (Tr. 8/1/05 at 217.)

Plaintiff had access to and used a computer at work during this time. (Tr. 8/2/05

at 74–75.) Thus, the Enrollment Bulletin and the 1999 Enrollment Guide were available to Plaintiff through Chase's intranet page.

### 6. *Plaintiff's BEC for 1999*

For the 1999 plan year, Plaintiff's BEC was $204,378.82. (Tr. 8/2/05 at 4; Defs.' Ex. 4.) Plaintiff's BEC figure was included on the front page of his PFS. (Defs.' Ex. 21–22.)

Even if Plaintiff had not received his PFS, however, he would have been able to calculate his BEC for 1999. Included in the enrollment materials distributed to CMMC employees in the fall of 1998 prior to open enrollment was a document entitled "Chase Home Finance Description of 'Eligible Compensation' for CHASEChoice Benefit Plans—Benefit Enrollment for 1999." (Tr. 8/2/05 at 3; Defs.' Ex. 42.) It stated that Plaintiff's eligible compensation for the LTD Plan and the LTD Excess Plan would be based upon his draw, commission, production overrides, and base salary, if any, for the time period from August 1, 1997, through July 31, 1998. (Tr. 8/2/05 at 3; Defs.' Ex. 42.) Plaintiff received a biweekly pay statement through interoffice mail. (Tr. 8/2/05 at 67–70; Defs.' Ex. 5A.) This information included all of the components of Plaintiff's BEC—base pay, draw, commission, and production overrides. (Tr. 8/2/05 at 68; Defs.' Ex. 5A.) As of the pay period of August 11, 1998, Plaintiff's year-to-date earnings were approximately $170,000.[6] (Defs.' Ex. 5B at CMMC001542.)

### 7. *Plaintiff's Benefit Elections for 1999*

### a. *Long–Term Disability*

Based on his BEC, Plaintiff was eligible to enroll in the LTD Excess Plan for 1999.

---

**6.** Plaintiff's actual BEC was higher, as it included his earnings from August 1, 1997,

through December 31, 1997, as well.

(Tr. 8/2/05 at 4; Defs.' Ex. 4.) During the open enrollment period, however, Plaintiff did not elect to enroll in the LTD Excess Plan for 1999. (Tr. 8/2/05 at 6; Defs.' Ex. 15.) His initial election for the basic LTD Plan at 70% of his eligible compensation, up to $160,000, continued in effect. (Tr. 8/2/05 at 6; Defs.' Ex. 15.)

#### b. Group Universal Life Coverage

During the open enrollment period for 1999, Plaintiff did make a change in his benefit elections for his Group Universal Life ("GUL") insurance coverage, however. Plaintiff elected the maximum amount of GUL insurance coverage available to him—$1.6 million, eight times his BEC—based on his BEC of $204,387. (Tr. 8/2/05 at 5–6; Defs.' Exs. 15, 27.) Based upon this election, it is clear that Plaintiff knew his BEC during the open enrollment period for 1999.

To make the GUL insurance election, Plaintiff would have had to use the one-CHASE telephone enrollment system during the enrollment period for 1999. (Tr. 8/2/05 at 6–7; Defs.' Exs. 18–19.) At that time, Plaintiff could have elected to enroll in the LTD Excess Plan as well.[7] (Tr. 8/2/05 at 99.) Plaintiff, however, did not make such an election.

#### E. Alleged Statement to Plaintiff

At trial, Plaintiff's wife, Maureen Hussey, testified that at some point during the fall of 1998, Plaintiff told her that he had checked into his long-term disability coverage. (Tr. 8/1/05 at 18.) According to Mrs. Hussey, Plaintiff was told in the fall of 1998 that he (Plaintiff) had the maximum amount of long-term disability coverage available to him. (Id. at 18–19.) Mrs. Hussey, however, could not identify what individual (or individuals) made such a statement to Plaintiff, nor whether the individual (or individuals) had the authority to make such a statement. (Id. at 40.) Mrs. Hussey also could not identify when such a statement was made to Plaintiff, other than a vague description that it occurred at "some time in the fall of [19]98." (Id. at 40–41.) Further, there was no testimony presented at trial to indicate that Plaintiff relied on this statement in any way in making his benefit elections for 1999.

#### F. Plaintiff's Long–Term Disability and Disability Payments

On October 28, 1999, Plaintiff suffered a severe and debilitating stroke. (Tr. 8/1/05 at 15–16.) This stroke left Plaintiff with severe expressive and receptive aphasia[8] and rendered him unable to work.[9] (Id.) Plaintiff is presently totally disabled from any occupation. (Id.)

Subsequent to Plaintiff's stroke, Maureen Hussey began the process of applying for short-term and long-term disability

---

**7.** The oneCHASE telephone system was programmed to access each employee's BEC and to determine if they were eligible to enroll in the LTD Excess Plan. (Tr. 8/2/05 at 99–101.) If Plaintiff wished to make a change to his long-term disability benefit plan, the oneCHASE system would have automatically prompted him with whether he wished to enroll in the LTD Excess Plan. (Id. at 99–102.) Thus, Plaintiff would not have needed to know his BEC in order to enroll in the LTD Excess Plan through oneCHASE.

**8.** Aphasia is the "[i]mpaired or absent comprehension or production of, or communication by, speech, writing, or signs, due to an acquired lesion of the dominant cerebral hemisphere." Thomas Lathrop Stedman, Stedman's Medical Dictionary 110 (27th ed.2000); see also Joseph R. Nolan & Jacqueline M. Nolan–Henry, Black's Law Dictionary 95 (6th ed.1990) (defining aphasia as "loss of the faculty or power to articulate speech").

**9.** Subsequent to his stroke, Plaintiff also had open heart surgery and suffered a seizure. (Tr. 8/1/05 at 15–16.)

benefits. (*Id.* at 20–21.) On April 25, 2000, Plaintiff received a letter from Lisa Glidden ("Glidden"), a disability claims case manager at Liberty Life Assurance Company of Boston ("Liberty"),[10] stating that Plaintiff was entitled to receive $9,333 per month, 70% of the $160,000 maximum allowed under the LTD Plan. (Pl.'s Ex. 4.) Because Plaintiff had not elected to enroll in the LTD Excess Plan, however, he was not eligible to receive 70% of his total compensation for the preceding twelve months, which was $313,800.48. (*Id.*)

Upon receiving this letter, Maureen Hussey thought that an error had been made in Plaintiff's long-term disability benefits. (Tr. 8/1/05 at 22–23.) Mrs. Hussey contacted Huegel and stated that she believed the amount of long-term disability benefits was incorrect. (*Id.* at 23.) On May 4, 2000, Glidden sent a new letter advising Plaintiff that his monthly benefit would be increased to $18,305.03 per month, or 70% of his total pre-disability earnings. (Pl.'s Ex. 5.) Plaintiff began receiving long-term disability benefits in the amount of $18,305.05 per month from May, 2000, through October, 2000. (Tr. 8/1/05 at 26.)

On October 27, 2000, Glidden informed Plaintiff that during an internal audit, Liberty had determined that Plaintiff did not in fact elect the LTD Excess Plan for 1999. (Pl.'s Ex. 90–B Ex. 14.) Glidden stated

that Barbara Stolfi, a human benefits employee at Chase, had confirmed that Plaintiff did not elect the LTD Excess Plan. (*Id.*) Accordingly, under the basic LTD Plan, Glidden stated that Plaintiff was entitled to a long-term disability benefit of 70% of his annual salary up to $160,000, resulting in a benefit payment of $9,333 per month.[11] (*Id.*) Since October, 2000, Plaintiff has received long-term disability payments of $9,333 per month. (Tr. 8/1/05 at 26.) The post-stroke confusion over the status of Plaintiff's benefits has little probative value when considering the issue of whether Defendants breached their pre-stroke fiduciary duty to Plaintiff.

## II. CONCLUSIONS OF LAW

### A. Fiduciary Duties Under ERISA

ERISA establishes certain obligations for fiduciaries[12] of employee welfare or pension benefits plans. *Varity Corp. v. Howe,* 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 384 (3d Cir.2003). Under ERISA, a fiduciary of a welfare or pension benefit plan must discharge his duties "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C.

---

**10.** Chase retained Liberty Life Assurance of Boston and Liberty Mutual Group to administer its LTD Plan. (Tr. 8/1/05 at 138–39.)

**11.** In the letter, Liberty also requested repayment of the excess payments made from May, 2000, through October, 2000. (Pl.'s Ex. 90–B Ex. 14.) This demand was later withdrawn.

**12.** Under ERISA, a fiduciary is any person who exercises any discretionary authority or discretionary control respecting management of an employee welfare or pension benefit plan. 29 U.S.C. § 1002(21)(a); *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 492 n. 17

(3d Cir.2000). It is undisputed that Defendant Director of Human Resources, Chase Manhattan Bank, is a fiduciary under ERISA for purposes of this case. (Mem. Law in Support of Defs.' Motion for Summary Judgment at 14 n. 10; Doc. No. 73 at 21.) We also conclude that Defendants CMMC, Chase Manhattan Bank, and J.P. Morgan Chase & Co. are also fiduciaries with respect to Plaintiff's claims. *See Fischer v. Phila. Elec. Co.,* 994 F.2d 130, 133 (3d Cir.1993) (holding that a corporation who is also a plan administrator is a fiduciary for purposes of a misrepresentation claim).

§ 1104(a)(1)(A) (2000); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

Under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a plan participant may assert a private cause of action for a breach of fiduciary duty. *Burstein,* 334 F.3d at 384; *see also Howe,* 516 U.S. at 509–15, 116 S.Ct. 1065. " 'Section 502(a)(3) authorizes the award of appropriate equitable relief directly to a participant or beneficiary to redress any act or practice which violates any provision of this title[,]' including a breach of the statutorily created fiduciary duty of a[ ] [plan] administrator." *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1298 (3d Cir.1993) (quoting *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 153, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring) (internal quotations omitted)).

In his Complaint, Plaintiff alleges that Defendants breached their fiduciary duty under ERISA by "fail[ing] to convey complete and accurate information regarding the benefits for which he was eligible" and the "steps to be taken to enroll in those benefits." [13] (Compl.¶ 31.) In other words, Plaintiff asserts that Defendants breached their fiduciary duties to Plaintiff by engaging in misrepresentation and/or a material omission regarding his eligibility for enrolling in the LTD Excess Plan for 1999.

## B. Misrepresentation

■ To establish a breach of fiduciary duty for a misrepresentation, a plaintiff must establish: "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation." *Daniels v. Thomas & Betts Corp.,* 263 F.3d 66, 73 (3d Cir.2001); *see also Romero v. Allstate Corp.,* 404 F.3d 212, 226 (3d Cir.2005) (same); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Skinner Engine Co.,* 188 F.3d 130, 148 (3d Cir.1999) (stating that in a misrepresentation case, a plaintiff must show that: "(1) the company was acting in a fiduciary capacity; (2) the company made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the company knew of the confusion generated by its misrepresentations or its silence; and (4) there was resulting harm to employees").

Plaintiff's misrepresentation claim is based on a statement allegedly made by an unnamed individual (or individuals) in the fall of 1998 who, according to Mrs. Hussey, told Plaintiff that he had the maximum amount of long-term disability coverage available to him. (Doc. No. 73 at 25–27 ¶¶ 14–15, 21–23.) This statement, however, cannot qualify as a breach of fiduciary duty for two reasons.

■ First, Plaintiff cannot establish that any Defendant acting as a fiduciary made the purported misrepresentation to Plaintiff. To establish a breach of fiduciary duty for misrepresentation, the plaintiff must show that a misrepresentation was made by a defendant who was an ERISA fiduciary acting as a fiduciary. *Burstein,* 334 F.3d at 384; *Daniels,* 263 F.3d at 73. "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens v. Hewitt Assocs.,* 508

---

**13.** Plaintiff also seeks relief against Defendants under an equitable estoppel theory. Plaintiff alleges that in April, 2000, Defendants "verified that Plaintiff was eligible for and enrolled in the [LTD][E]xcess [P]lan" and therefore should be estopped from asserting Plaintiff did not enroll in the LTD Excess Plan for plan year 1999. (Compl.¶ 34.)

U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). "[U]nder ERISA, a person 'is a fiduciary with respect to a plan' only 'to the extent' that 'he has any discretionary authority or discretionary responsibility in the administration of such plan.' " *Varity Corp.*, 516 U.S. at 527, 116 S.Ct. 1065 (quoting 29 U.S.C. § 1002(21)(A)(iii)); *see also Confer v. Custom Eng'g Co.*, 952 F.2d 34, 36 (3d Cir.1991) ("In determining who is a fiduciary under ERISA, courts consider whether a party has exercised discretionary authority or control over a plan's management, assets, or administration."). Here, Plaintiff has presented no evidence whether the individual(s) who made the alleged misrepresentation were fiduciaries under ERISA. The only evidence presented at trial regarding the alleged misrepresentation was the testimony of Maureen Hussey. Mrs. Hussey could not identify what individual(s) made such a statement to Plaintiff, nor whether the individual had the authority to make such a statement. (Tr. 8/1/05 at 18–19, 40.) In fact, Mrs. Hussey did not even identify whether the individual(s) who made the alleged misrepresentation were employees of Chase. Accordingly, we must conclude that no defendant who was an ERISA fiduciary acting as a fiduciary made a misrepresentation to Plaintiff regarding his long-term disability benefits eligibility.

■ Second, at the time that the alleged "misrepresentation" was made to Plaintiff, it appears that it was not actually a misrepresentation. A statement that is true when made obviously cannot give rise to a breach of fiduciary duty claim. *Diamore v. Am. Honda Motor Co.*, 248 F.Supp.2d 82, 86 (D.Conn.2002); *see also McCall v. Burlington N. R.R. Co.*, 237 F.3d 506, 514 (5th Cir.2000) (holding that representa-

tions that are true when made are not material misrepresentations). Ms. Hussey testified at trial that, at some unknown time during the fall of 1998, Plaintiff was told that he had the maximum amount of long-term disability benefits available to him. (Tr. 8/1/05 at 18–19, 40–41.) In fact, during the fall of 1998, Plaintiff *was* covered by the maximum amount of long-term disability benefits available to him. During benefit elections in the fall of 1997, which were effective for all of calendar year 1998, Plaintiff had a BEC of $50,000. (*Id.* at 201; Pl.'s Ex. 2.) At that time, Plaintiff was not eligible to elect the LTD Excess Plan, as his BEC was below the $160,000 eligibility threshold. (Tr. 8/1/05 at 201; Pl.'s Ex. 2.) Plaintiff made no change to his long-term disability benefit election during open enrollment in the fall of 1997, so his initial election of 70% coverage under the basic LTD Plan continued for calendar year 1998. (Tr. 8/1/05 at 213; Defs.' Ex. 14.) Thus, in the fall of 1998, Plaintiff was covered for the maximum amount of long-term disability coverage available to him for *1998*. Plaintiff only became eligible to receive coverage under the LTD Excess Plan starting on January 1, 1999.[14] (Tr. 8/2/05 at 4; Defs.' Ex. 4.) Accordingly, we conclude that the alleged statement made to Plaintiff does not qualify as a misrepresentation.

## C. Omission

■ Under ERISA, "a fiduciary has a legal duty to disclose to the beneficiary those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection." *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 461 (3d Cir. 2003); *see also Bixler*, 12 F.3d at 1300 (stating that the fiduciary duty to inform

14. Of course, Plaintiff would have had to elect the LTD Excess Plan during open enrollment in the fall of 1998 for it to take effect in calendar year 1999, but that does not change

the fact that Plaintiff in fact had the maximum possible long-term disability coverage during the fall of 1998.

"entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful"). To establish a breach of fiduciary duty for failure to disclose information, a plaintiff must establish that: "(1) the company was acting in a fiduciary capacity; (2) the company ... failed to adequately inform plan participants and beneficiaries; (3) the company knew of the confusion generated by ... its silence; and (4) there was resulting harm to employees." *Skinner Engine Co.*, 188 F.3d at 148.

Plaintiff asserts that Defendants failed to adequately inform him regarding his eligibility for the LTD Excess Plan. (Compl. ¶ 31; Doc. No. 72 at 24 ¶ 14.) We reject this assertion. The primary means of communicating information about the terms of an employee benefit plan is the plan summary. *See, e.g., Local 56, United Food and Comm. Workers Union v. Campbell Soup Co.*, 898 F.Supp. 1118, 1130 (D.N.J.1995). In this Circuit, a fiduciary may satisfy its statutory disclosure obligations under ERISA regarding the terms of a benefit plan by distributing a plan summary that reasonably appraises a participant of his or her rights and obligations under the plan. *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3d Cir.1995).

In this case, Defendants provided Plaintiff with multiple plan summaries that more than adequately informed him of the eligibility requirements for electing the LTD Excess Plan. At the time of his hiring in June 1997, Huegel provided Plaintiff with the "Welcome to Chase" binder, which clearly stated that the optional LTD Excess Plan was available to all employees with an annual BEC in excess of $150,000. (Pl.'s Ex. 85 at B–48; *see also id.* at B–90 ("If your eligible compensation as of your hire date is more than $150,000 and you elect to be covered by the LTD Plan, you will have the option of enrolling in the LTD Excess Plan.").) Less than four months later, in October 1997, Defendants distributed to all employees a copy of the Enrollment Bulletin and Enrollment Kit for 1998 via interoffice mail. The 1998 Enrollment Guide, which was included in the Enrollment Kit, explained that all employees with a BEC in excess of $160,000 were eligible to participate in the LTD Excess Plan for 1998. *See* Defs.' Ex. 12 at 36 ("If you choose coverage under LTD and your annual eligible compensation is more than $160,000, you may also choose to enroll in the LTD Excess Plan."). Finally, during the open enrollment for 1999, Defendants made accessible to all employees a copy of the 1999 Enrollment Guide through the Lotus Notes email program, through the intranet page, and through the oneCHASE telephone system. (Tr. 8/1/05 at 226; Defs.' Ex. 17 at unnumbered 1.) In the 1999 Enrollment Guide, Chase employees were informed, in language identical to that contained in the 1998 Enrollment Guide, that employees with a BEC of greater than $160,000 were eligible to elect the LTD Excess Plan benefit. *See* Defs.' Ex. 19 at 33 ("If you choose coverage under LTD and your annual compensation is more than $160,000, you may also choose to enroll in the LTD Excess Plan.").

In addition, Defendants complied with the relevant Department of Labor ("DOL") regulations for adequate distribution of the summary plan. The DOL regulations provide that an ERISA fiduciary is required to use means reasonably calculated to ensure that a beneficiary will receive the summary plan materials:

> [T]he plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals. Material which is required to be furnished to all participants covered under the plan and beneficiaries receiving benefits under the

plan (other than beneficiaries under a welfare plan) must be sent by a method or methods of delivery likely to result in full distribution. For example, in-hand delivery to an employee at his or her worksite is acceptable. . . .

29 C.F.R. § 2520.104b–1(b) (2004). Accordingly, the DOL regulations "have been interpreted to require employee benefit plan[ ] [administrators] to prove that they sent the [summary plan descriptions], but not that the participants received them." *Campbell v. Emery Air Freight Corp.,* Civ. A. No. 93–6568, 1995 WL 286722, at *1 (E.D.Pa. May 9, 1995); *see also Aiello v. Midwest Operating Eng'rs Health & Welfare Fund,* Civ. A. No. 91 C 7998, 1993 WL 81437, at *3 (N.D.Ill. Mar. 19, 1993) (holding that ERISA does not require a fiduciary to prove that the beneficiary actually received the summary plan materials). Here, we conclude that Defendants distributed the summary plan materials to Plaintiff in a manner that was reasonably calculated to ensure that Plaintiff actually received the materials. The initial "Welcome to Chase" binder was hand delivered to Plaintiff on his first day of employment at CMMC by Huegel. (Tr. 8/1/05 at 60; Tr. 8/2/05 at 64–65.) The 1998 Enrollment Guide was delivered to Plaintiff via interoffice mail. (Tr. 8/1/05 at 193–5; Defs.' Ex. 9.) The 1999 Enrollment Guide was made accessible to Plaintiff through a variety of means, including access through his work computer and upon request via the oneCHASE telephone system. (Tr. 8/1/05 at 216–17, 226; Defs.' Ex. 17 at unnumbered 1.) These methods of delivery were more than sufficient to ensure that Plaintiff received the relevant plan materials regarding his eligibility for the LTD Excess Plan.

We also conclude that Defendants provided Plaintiff with adequate information regarding his BEC so that, in conjunction with the information in the summary plans, he could determine that he was eligible to elect the LTD Excess Plan. For the 1999 plan year, Plaintiff's BEC was $204,378.82. (Tr. 8/2/05 at 4; Defs.' Ex. 4.) This BEC figure was included on the front page of his PFS, which he received prior to open enrollment in the fall of 1998. *See supra* Part I.D.3. Plaintiff also could have determined his BEC by reviewing his biweekly pay statement, which he received through interoffice mail. (Tr. 8/2/05 at 67–70; Defs.' Ex. 5A.) Finally, lest there be any doubt about Plaintiff's knowledge of his BEC for the plan year 1999, Plaintiff actually elected to change his Group Universal Life Insurance coverage to the maximum coverage available, eight times his BEC or $1.6 million. When he made this change, however, he evidently chose not to enroll in the LTD Excess Plan which would have provided coverage for the increase in his BEC.

Because the Chase Defendants satisfied ERISA's statutory and regulatory disclosure requirements, Plaintiff is charged with knowledge of the terms of Chase's employee benefits plans, including the eligibility requirements of the LTD Excess Plan. *See Jordan v. Fed. Express Corp.,* 116 F.3d 1005, 1016 (3d Cir.1997) ("[P]articipants have a duty to inform themselves of the details provided in their plans. . . ."). Accordingly, we conclude that Defendants adequately informed Plaintiff of all material facts necessary for him to elect the LTD Excess Plan. Defendants therefore have not breached their fiduciary duty toward Plaintiff by a material omission.

For the forgoing reasons, we are compelled to conclude that Defendants did not breach their fiduciary duty to Plaintiff under ERISA as alleged in Plaintiff's Complaint.[15]

An appropriate Order follows.

15. We have considered all exhibits submitted

by both *Plaintiff and Defendants in reaching*

## ORDER

AND NOW, this 1st day of September, 2005, in accordance with the Findings of Fact and Conclusions of Law in the attached Memorandum, the Court finds in favor of Defendants and against Plaintiff Joseph Hussey. Accordingly, JUDGMENT is entered in favor of Defendants Chase Manhattan Bank, Chase Manhattan Mortgage Corporation, JP Morgan Chase & Co., and Director of Human Resources, Chase Manhattan Bank.

IT IS SO ORDERED.

the conclusion that there was no ERISA viola-